NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

Richard A. BYRD,

      Plaintiff,

v.

MERRILL LYNCH,

      Defendant.

Civ. No. 10-0247

MEMORANDUM OPINION

THOMPSON, U.S.D.J.

## I.  INTRODUCTION

This matter comes before the Court on the Motion for Summary Judgment [docket # 21] filed by Defendant Merrill Lynch.[1]  Plaintiff Richard A. Byrd opposes the motion [26].  The Court has decided the matter after considering the parties' submissions and without holding oral argument, pursuant to Fed. R. Civ. P. 78(b).  For the reasons given below, the Defendant's motion is granted.

## II.  BACKGROUND

Plaintiff is an African-American man who worked for Merrill Lynch from 1995 until his termination on December 15, 2008.  (Def.'s Statement of Undisputed Material Facts in Supp. of Summ. J. ¶ 1) ("Def. SUF") [21-2]; (Compl. ¶ 6, 18) [1].  Plaintiff claims that he was terminated because of his race and sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981 *et seq.*, and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-12.  (Compl. ¶ 20.)

---

[1] Defendant states that it is improperly named in the Complaint as Merrill Lynch, a Wholly Owned Subsidiary of Bank of America, and that the proper name is Merrill Lynch, Pierce, Fenner & Smith, Inc. (Mem. in Supp. of Mot. for Summ. J. 1) [21-1].

More specifically, Plaintiff believes he was discriminated against because he was perceived to be in a romantic relationship with a Caucasian female colleague.  In moving for summary judgment, Defendant responds that Plaintiff has failed to establish a prima facie case of discrimination, and even if Plaintiff had met his initial burden, Defendant had a legitimate, non-discriminatory reason for firing him: he violated the company's anti-harassment policy.  (Mem. in Supp. of Mot. for Summ. J. 2) [21-1].

In 1995, Plaintiff began working for Merrill Lynch in New Jersey.  (Def. SUF ¶ 1.) When he was terminated in 2008, Plaintiff was working in the Cash Management Account Operations ("CMA") Department as a supervisor of the unit tasked with monitoring fraudulent activity on credit cards.  (*Id.* at ¶¶ 1, 3.)  In the CMA Department, Plaintiff reported to Matt Cissne, Manager of CMA Operations, who reported to James Macklin, Director of CMA Operations.  (*Id.* at ¶ 2.)  Merrill Lynch maintains an anti-harassment policy, which prohibits unlawful discrimination and harassment—including actions, words, jokes, and comments—based on sex or other legally-protected characteristics.  (*Id.* at ¶ 4.)  Plaintiff was familiar with and had access to this policy.  (*Id.* at ¶ 6.)

In 2004, Merrill Lynch received complaints from two African-American female employees who alleged that Plaintiff—their supervisor—disrespected women and minorities, leered at women, and referred to himself as the "head nigger in charge."  (*Id.* at ¶¶ 8–9.) Employee Relations representative Carol Wolkiewicz investigated the complaints, interviewing the accusers and Plaintiff.  Plaintiff denied the allegations, insisting that the women were retaliating against him for changing their work schedules.  (*Id.* at ¶ 10.)  Wolkiewicz documented the complaints and her investigation in a memorandum, which she emailed to Plaintiff and placed in Plaintiff's employment file.  (*Id.* at ¶¶ 11–12 (citing Decl. of Carol Wolkiewicz, Ex. A

[22-1] and Ex. B [22-2]).)  She also advised Plaintiff of the importance of respect and professionalism in the workplace.  (Decl. of Carol Wolkiewicz ¶ 7) [22].

In 2008, Merrill Lynch again received a complaint from a female employee stating that Plaintiff had subjected her and other women to unwelcome comments and touching.  (Def. SUF ¶ 15); (Decl. of Janice Miholics ¶ 10) [21-4].  Plaintiff was placed on administrative leave pending an investigation.  (Def. SUF ¶ 16.)  The investigation was performed by Vice President of Employee Relations Sharon Lontoc, who interviewed approximately ten employees.  (*Id*. at ¶ 19.)  According to the declaration of Senior Vice President of Human Resources, Janice Miholics, a number of the employees interviewed by Lontoc indicated that Plaintiff had touched them inappropriately and made inappropriate sexual comments, including "let's have sex and get it over with," "damn you look good today," and "boy, you fill out your shirt nicely."[2]  (Decl. of Janice Miholics ¶¶ 11–12.)  Lontoc then interviewed Plaintiff about the allegations.  (Def. SUF ¶ 22.)  Plaintiff denied doing anything inappropriate but admitted that he "probably did touch someone's shoulder" and "maybe [he] left [his] hand there too long . . . ."  (Certification of Richard A. Byrd, Ex. A, Byrd Dep. 138:8–10) ("Byrd Dep.") [27-1].  He also acknowledged that he has probably said things like, "oh, you look nice today," but denied asking any employee for sex.  (Byrd Dep. 135:2–5, 143:1–10.)  After completing the investigation, Merrill Lynch terminated Plaintiff's employment on December 15, 2008.  (Def. SUF ¶ 32.)  The ultimate decision to fire Plaintiff was made by James Macklin, the Director of CMA Operations, and Cheryl Ely, a Human Resources Vice President.  (Opp'n Br. 21–22.)

Although Plaintiff does not dispute the facts and events set forth above, he contends that there is another explanation for the 2004 and 2008 incidents that led to his termination.  Plaintiff

---

[2] Plaintiff disputes not only the underlying allegations but also the admissibility of this portion of the Miholics Declaration because it contains double-hearsay statements from unnamed employees.  (Pl.'s Resp. to Def. SUF ¶¶ 19–21) [29].  We address this issue below.

states that in 2004, he and unit co-supervisor Andrew Kemper changed the work schedules of several of their subordinates.  (Pl.'s Statement of Uncontested Facts ¶¶ 1–2) ("Pl. SUF") [28].  This change caused a backlash from their subordinates, and soon after, the human resources department began receiving complaints against Plaintiff and Kemper.  (Pl. SUF ¶ 3–4.)  Plaintiff believes that the 2004 accusations were fabricated by his subordinates in an attempt to get him fired and get their old schedules back.  (Pl. SUF ¶ 4.)  These complaints led to the Wolkiewicz investigation and the consequent memorandum placed in Plaintiff's file.  During her investigation, Wolkiewicz never interviewed Kemper about the allegations against him or Plaintiff.  (Pl. SUF ¶ 5.)  Plaintiff believes Kemper would have corroborated his version of events, and he now claims that the 2004 investigation was biased, incompetent, and incomplete because of the failure to interview Kemper.  (Pl.'s Resp. to Def. SUF ¶ 9–10.)

Plaintiff states that, in 2008, with the threat of layoffs looming, his subordinates again conspired to have him terminated by filing false sexual harassment complaints.  (Pl. SUF ¶ 11.)  Plaintiff believes the basis for these 2008 complaints—which led to the investigation by Sharon Lontoc and eventually to Plaintiff's termination—was  his perceived romantic relationship with another employee, a Caucasian female named Marina Uva with whom Plaintiff had been friends for years but never romantically involved.  (Pl. SUF ¶ 12.)  In part, Plaintiff's conclusion appears to be based on an incident recounted in Uva's certification describing how, prior to the complaints being filed against Plaintiff, she observed an email that she now believes referred to a conspiracy to target Plaintiff based on their relationship.  (Certification of Marina Uva ¶ 7) [27].  Uva's cryptic certification does not relate what the email said or explain how she came to the conclusion that it was evidence of an alleged conspiracy.

Plaintiff believes that it was the interracial nature of the perceived relationship that Defendant disapproved of and that Defendant's decision to terminate him was motivated, at least

in part, by the intent to discriminate against his association with Uva.  It is unclear, however, how Plaintiff makes the leap from contending that his accusers were motivated by Plaintiff's perceived relationship with Uva to arguing that Lontoc's investigation and Ely and Macklin's ultimate decision to terminate him were also motivated by the relationship.  In any event, Plaintiff claims that "it is obvious that [Lontoc] was biased and had her mind made up from the outset."  (Opp'n Br. 14.)  To support this claim, Plaintiff highlights four pieces of evidence: (1) Lontoc mistreated Uva during the investigation; (2) Lontoc's investigation focused inordinately on Plaintiff's relationship with Uva; (3) the investigation ignored key witnesses who would have been favorable to Plaintiff; and (4) Plaintiff's supervisor, Matt Cissne, was retaliated against for supporting Plaintiff.  (*Id.*)  According to Plaintiff, this evidence also shows that the internal investigation conducted by the Defendant did not satisfy guidelines set by the Equal Employment Opportunity Commission ("EEOC"), and the Court should thus discredit the outcome of the investigation.  (*Id.* at ¶¶ 13–14.)

    In addition to the evidence that supposedly shows Lontoc's bias, Plaintiff adds other facts to support his claim.  First, Plaintiff names four other pairs in the CMA department who were apparently perceived to be in a romantic relationship.  (Pl. SUF ¶ 25); (Opp'n Br. 29).  Plaintiff alleges that, because none of the pairs involved mixed races, none were the target of complaints. (Opp'n Br. 29.)  Second, Plaintiff submits a certification from another Merrill Lynch employee, Phillip Justin Hill, recounting an incident in which one of Plaintiff's accusers boasts about how she and other women got Plaintiff fired.  (Certification of Philip Justin Hill ¶¶ 6–9) [27].

III. <u>ANALYSIS</u>

**A.  Legal Standard**

Summary judgment is proper when "the pleadings, the discovery and disclosure

materials, and any affidavits show that there is no genuine issue as to any material fact and that

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The Court will

"view the inferences to be drawn from the underlying facts in the light most favorable to the

party opposing the motion." *Id.*; *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002).  In

resolving a motion for summary judgment, the Court must determine "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–

52 (1986).  More specifically, the Court must grant summary judgment against any party "who

fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*,

477 U.S. 317, 322 (1986).  If the movant's motion is supported by facts, the party opposing

summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its

response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P.

56(e)(2).  More than a mere "scintilla of evidence" supporting the non-moving party is required.

*Anderson*, 477 U.S. at 252.  Properly applied, Rule 56 will "isolate and dispose of factually

unsupported claims or defenses" before those issues come to trial. *Celotex*, 477 U.S. at 323–24.

**B.  Legal Framework for Employment Discrimination**

Plaintiff brings his employment discrimination claims under Title VII, 42 U.S.C. § 1981

*et seq.*, and the New Jersey Law Against Discrimination ("NJLAD"), 10:5-1 *et seq.*  Courts

interpret the NJLAD and the corresponding Title VII provisions identically, so our analysis of

Plaintiff's Title VII claims applies to the NJLAD claims as well. *See Aman v. Cort Furniture*

*Rental Corp.*, 85 F.3d 1074, 1087–88 (3d Cir. 1996) (holding that unlawful discrimination claims under the NJLAD "parallel" Title VII claims and therefore employ the same legal framework).

Title VII "has made it an 'unlawful employment practice for an employer . . . to discriminate against any individual . . . , because of such individual's race, color, religion, sex, or national origin.'" *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 93 (2003) (quoting 42 U.S.C. § 2000e–2(a)(1)).  When analyzing a claim of unlawful employment discrimination, we proceed under "either the pretext theory set forth in *McDonnell Douglas Corp. v. Green*," 411 U.S. 792, 798 (1973), "or the mixed motive theory set forth in *Price Waterhouse v. Hopkins*," 490 U.S. 228, 244–45 (1989).  *Makky v. Chertoff*, 541 F.3d 205, 213 (3d Cir. 2008).

1.  McDonnell Douglas

A claim proceeding under the pretext theory follows the familiar burden-shifting framework established in *McDonnell Douglas*.  A plaintiff must first establish a *prima facie* case, by showing that: (1) he is a member of a protected class; (2) he was qualified for the position he sought to attain or retain; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of discrimination.  *Makky*, 541 F.3d at 214 (citing *McDonnell Douglas*, 411 U.S. at 802).  The plaintiff bears the initial burden of proving a *prima facie* case by a preponderance of the evidence.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993).

If a plaintiff establishes a *prima facie* case of discrimination, then an inference of discrimination arises and the burden shifts to the defendant to "articulate some legitimate non-discriminatory reason for the employee's termination."  *McDonnell Douglas*, 411 U.S. at 802.  If the defendant does so, the inference drops out and the burden shifts back to the plaintiff to produce evidence that the employer's proffered reasons were merely a pretext for intentional discrimination.  *Makky*, 541 F.3d at 214 (citing *St. Mary's Honor Ctr.*, 509 U.S. at 507–08).

7

2.  Mixed Motive

Under the *Price Waterhouse* mixed motive theory, "a plaintiff may show that an employment decision was made based on both legitimate and illegitimate reasons." *Makky*, 541 F.3d at 213.   The Supreme Court has held that a plaintiff can satisfy his initial burden in a mixed motive case by "present[ing] sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice." *Desert Palace*, 539 U.S. at 101 (citing 42 U.S.C. § 2000e-2).   That evidence can be direct or circumstantial.  *Id.* at 92–93.  When a plaintiff comes forward with evidence that a discriminatory factor played a "motivating part" in an adverse employment action, the defendant can "avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken" improper considerations into account.  *Price Waterhouse*, 490 U.S. at 257.

**C.  Application**

1.  McDonnell Douglas

Defendant argues that Plaintiff's claim cannot survive the first stage of the *McDonnell Douglas* framework.  (Mem. in Supp. of Mot. for Summ. J. 7) [21-1].  Defendant further argues that, even if Plaintiff could establish a *prima facie* case of discrimination, the company has provided a legitimate non-discriminatory reason for his termination—violation of the anti-harassment policy—and Plaintiff has failed to carry his ultimate burden of showing that this facially legitimate reason was pretextual.  (*Id.*)  For the reasons explained below, we agree that Plaintiff has failed to produce sufficient direct or circumstantial evidence to raise a genuine issue of material fact as to whether his termination was motivated by an impermissible consideration.

### a.  Prima Facie Case

At the first step, we consider the evidence that would support a *prima facie* case of discrimination.  Although Defendant concedes that Plaintiff is a member of a protected class, was qualified for his position, and suffered adverse employment action, it contends that Plaintiff has not put forward sufficient evidence to show that his termination "occurred under circumstances that could give rise to an inference of intentional discrimination."  *See Makky*, 531 F.3d at 214.  Plaintiff counters that the evidence he submitted, including certifications from Kemper, Hill, Uva, and Plaintiff himself, is sufficient to create an inference of discrimination. (Opp'n Br. 26–29.)  We note that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous."  *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). This first stage serves merely to "eliminate the most common nondiscriminatory reasons for the plaintiff's" termination.  *Id.*  Because the initial threshold is so low, we will assume that Plaintiff has met the minimal burden of establishing a *prima facie* case.  However, as we will explain below, Plaintiff cannot satisfy the higher burden of showing pretext at stage three.

### b.  Articulated Legitimate Non-discriminatory Reason

At the second stage, a defendant must "articulate some legitimate non-discriminatory reason for the employee's termination."  *McDonnell Douglas*, 411 U.S. at 802.  A defendant's burden at this stage is merely one of production; "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons."  *Burdine*, 450 U.S. at 254.  "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted[.]"  *Id*. at 255.

Defendant claims that Plaintiff was terminated because he was found to have violated the company's sexual harassment policy.  (Mem. in Supp. of Mot. for Summ. J. 2.)  Clearly, this reason is legitimate and non-discriminatory.  *See Moussa v. Pa. Dep't. of Pub. Welfare*, 413 F.

App'x 484, ----, 2011 WL 187680, at *2 (3d Cir. Jan. 21, 2011) (affirming district court's holding that "Defendants had articulated a legitimate, nondiscriminatory reason for [Plaintiff's] termination (namely, his repeated sexual harassment of his co-workers)").  So the only remaining question at this stage is whether Defendant has satisfied its burden by producing "*admissible* evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus."  *Burdine*, 450 U.S. at 257 (emphasis added); *see also id*. n.9 ("An articulation not admitted into evidence will not suffice.").

Defendant presents the following evidence to demonstrate that it had legitimate grounds for firing Plaintiff: Defendant maintained a sexual harassment policy, (Def. SUF ¶ 4; *see also* Byrd Dep. 74:5–20); Plaintiff was familiar with and had access to that policy, (Def. SUF ¶ 6 (citing Byrd Dep. at 74)); (Pl.'s Resp. to Def. SUF ¶ 6); Plaintiff was accused of violating the policy, (Def. SUF ¶¶ 8, 15–16); (Pl.'s Response to Def. SUF ¶ 8); Defendant investigated the accusations, (Def. SUF ¶ 16 (citing Byrd Dep. at 84–85, 87–88, 92)); and after the investigation was complete, Plaintiff was notified that Merrill Lynch had grounds to terminate him, (Def. SUF ¶ 32 (citing Byrd Dep. at 152–53)).  What is more, Defendant points out that Plaintiff himself believed that he "was fired for sexual harassment."  (Byrd Dep. 154:1–2); (*see also id*. at 155:14–18 ("Q: Do you have any reason to believe that the reason for the termination was something other than the investigation proved or supported sexual misconduct?  A: At the time, I would say no.")).  We find Defendant's evidence sufficient to show that Defendant has satisfied its stage-two burden by articulating that the reason for Plaintiff's termination was his violation of the company's sexual harassment policy.

Despite this, Plaintiff proffers two reasons why Defendant has not met its burden: (1) the Court should not consider the Miholics declaration because it contains hearsay (Opp'n Br. 3), and (2) the Court should disregard the outcome of the sexual harassment investigation because

Defendant's policies do not meet the requirements for an effective investigation under the EEOC guidelines, (*id*. at 9).  We find both of these arguments without merit.

First, the Miholics declaration—which summarizes Merrill Lynch's anti-harassment policies and the 2008 investigation undertaken by Lontoc—fits squarely within established exceptions to the bar on hearsay evidence.  Plaintiff's first concern is that Miholics was not personally involved in the investigation but is only describing the investigation Lontoc performed.  However, Miholics's declaration is "based upon [her] own personal knowledge and upon a review of the records created and maintained by Merrill Lynch[.]"  (Decl. of Janice Miholics ¶ 1) [21-4].  In a supplemental declaration, Miholics clarifies that, in preparing her declaration, she "relied on Lontoc's investigative file" which was "created by Lontoc during the course of her internal investigation of Plaintiff" and copies of which were kept "in the ordinary course of business."  (Miholics Supp. Decl. ¶¶ 5–7) [33-1].  Lontoc's investigative file is attached as an exhibit to the supplemental declaration.  (*Id*.)  Accordingly, the investigative file is almost certainly admissible as a business record under Federal Rule of Evidence 803(6).[3]  *See Brauninger v. Motes*, 260 F. App'x 634, 636–639 (5th Cir. 2007) (finding that investigation and documentation by a human resource manager of employee complaints of sexual harassment were admissible as business records); *La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 481 n.7 (5th Cir. 2002) (finding that human resource manager's notes regarding sexual harassment investigation were admissible business records).  The Miholics declaration is merely a distillation of facts drawn directly from the investigative file, and Plaintiff is thus not unfairly prejudiced by our consideration of the declaration.  Next, Plaintiff argues that the Miholics declaration contains

---

[3] Additionally, Plaintiff objects to Defendant's submission of the Miholics Supplemental Declaration (submitted along with Defendant's Reply Brief [31]) on the grounds that it is inappropriate to raise new arguments in a reply brief.  But Defendant is not raising a new argument; it is merely responding to the evidentiary objection raised by plaintiff—an objection we find meritless.  Moreover, Plaintiff is not prejudiced by the Supplemental Declaration because the declaration presents no additional factual information and because it relies on documents that are already in Plaintiff's possession.

double hearsay because it relates statements made to Lontoc by unnamed accusers.  (Opp'n Br.

3.)  But the accusers' statements would likely qualify as non-hearsay because they are offered

not for their truth but to show that accusations of sexual harassment were made, that Defendant

investigated them, and that Defendant decided to terminate Plaintiff as a result.  What matters is

that Defendant believed the accusations were true and acted upon them.  Thus, those statements

are not hearsay.  *See Brauninger*, 260 F. App'x at 636–37 (holding that human resource

manager's reports, which included witness statements, were not hearsay where the "key issue

[was] not whether the accusations [against the employee] were true but instead whether [the

defendants] relied on them" in making the termination decision).

      Second, Plaintiff argues that Defendant has not met its burden because the results of the

internal investigation should be disregarded for failure to comply with the EEOC's guidelines

titled "Enforcement Guidance on Vicarious Employer Liability for Unlawful Harassment by

Supervisors," which set forth the anti-harassment policies and procedures a company should

follow to avoid being vicariously liable for the actions of supervisors.  In particular, Plaintiff

states that the investigation violated Defendant's policy on confidentiality, that Wolkiewicz

never interviewed Kemper in response to the 2004 complaints, and that Lontoc never produced a

written report of her findings from the 2008 investigation.  (Opp'n Br. 13–14.)  These defects,

Plaintiff argues, demonstrate that the investigation was not impartial and fair as stated in the

EEOC guidelines.  (*Id.* at 13 (citing 29 C.F.R. § 1604.11).)  We disagree.  As an initial matter,

Plaintiff has presented no case law suggesting that the remedy for an allegedly deficient internal

investigation is for the court to reject the outcome of that investigation.  The case on which

Plaintiff relies, *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), held that "[a]n employer is

subject to vicarious liability to a victimized employee for an actionable hostile environment

created by a supervisor with immediate (or successively higher) authority over the employee"

12

but that, as one element of an affirmative defense, the employer can show "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior[.]" *Id*. at 807.  The EEOC guidelines were cited as policy support for the Court's decision to sanction an affirmative defense for employers, but the case appears to have no bearing on the *McDonnell Douglas* burden-shifting framework.  Moreover, we do not agree that Defendant's internal investigation was inadequate.  Plaintiff has not explained what confidentiality violation occurred or how any such violation would lead to an unfair investigation.  Nor does Wolkiewicz's failure to interview Kemper suggest bias.  At most, it would suggest that the investigation was less thorough than it could have been, which is insufficient to support a claim of discrimination.  S*ee Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) ("[T]he factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").  But an equally plausible explanation is that Wolkiewicz chose not to interview Kemper because Kemper himself would be biased against the accusers and in favor of Byrd.  Accusations of racism were leveled at Kemper as well, (Pl. SUF ¶ 4), and there was apparently a perception that Byrd and Kemper were close friends, (Pl. SUF ¶ 8 ("There was constant complaining that the two of them were always laughing and talking. . . . [A]nd why did they always have to go to the gym together at lunch time.")).  Finally, Lontoc's failure to produce a written report does not cast doubt on the conclusion that Plaintiff was terminated as a result of the investigation of sexual harassment complaints against him—a conclusion that Plaintiff himself reached.  (*See* Byrd Dep. 154:1–2, 155:14–18.)

Thus, based on the evidence submitted by Defendant, including the documents associated with the sexual harassment investigation, we find that Defendant has proffered a legitimate non-discriminatory ground for Plaintiff's termination.

### c.  Pretext

Once an employer has articulated legitimate grounds for termination, any presumptions raised by the *prima facie* case are rebutted, and the employee is left with the ultimate burden of proving that the articulated reasons were a pretext for intentional discrimination.  *Burdine*, 450 U.S. at 255.  "To survive summary judgment, the employee must then 'point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Khazzaka v. Univ. of Scranton*, 148 F. App'x 72, 74 (3d. Cir. 2005) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).  An employee "need not also come forward with additional evidence of discrimination beyond his . . . prima facie case."  *Fuentes*, 32 F.3d at 764.  Rather, evidence supporting the *prima facie* case and inferences drawn therefrom may permit a trier of fact to find the defendant's explanation pretextual.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (citing *Burdine*, 450 U.S. at 255).  Pretext may be shown by exposing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'"  *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 504 (3d Cir. 1997) (quoting *Fuentes*, 32 F.3d at 765).  However, in order "[t]o discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  *Fuentes*, 32 F.3d at 765.  "[A]n employer would be entitled to judgment as a matter of law if . . . the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was

14

abundant and uncontroverted independent evidence that no discrimination had occurred."
*Reeves*, 530 U.S. at 148.

The key issue, therefore, is whether Plaintiff has raised a material issue of fact as to whether Defendant's nondiscriminatory reason for terminating Plaintiff was a pretext for intentional discrimination.  In his Complaint, Plaintiff claims that a "cabal of Afro-American female representatives" resented his relationship with Marina Uva, leading the women to make false sexual harassment allegations against Plaintiff.  (Compl. ¶ 15, 17.)  However, the Complaint never connects the alleged discriminatory motivations of his accusers to Defendant's decision to terminate him.  Nothing in the Complaint suggests that Defendant knew the accusations were false and nevertheless pursued the investigation as a pretext for discrimination. And nothing in the Complaint suggests that Defendant's decision to terminate him was based on anything other than the good faith belief of the investigators and those who ultimately made the termination decision that Plaintiff had in fact violated Defendant's anti-harassment policies. Indeed, Plaintiff himself seemed to have originally believed that he was terminated solely because Defendant found the accusations credible.  In his deposition, Plaintiff conceded that, during the 2004 investigation, Wolkiewicz was simply doing her job, and he had no reason to think that she believed Plaintiff's accusers over Plaintiff.  (Byrd Dep. 56:17–25.)  As for the 2008 investigation, Plaintiff stated that, aside from questions about Uva, Lontoc was just asking "basic questions that she had to ask." (Byrd Dep. 139:13–22.)  Plaintiff also stated that he thought that Lontoc honestly did believe the allegations against Plaintiff.  (*Id.* at 141:11–15.)

Even assuming Plaintiff could muster sufficient evidence that his accusers were motivated by racial animus, his claim would likely fail because he would need to show also that the decision to terminate him was made based on racial animus and not simply based on a finding that the accusations were true.  Perhaps having realized that his Complaint was silent on

this fundamental issue and that his deposition testimony actually undercut his claims, Plaintiff

has now submitted an affidavit in support of his opposition to summary judgment in which he

disavows his earlier deposition testimony.  He declares that he has "reconsidered [his earlier]

statement that Ms. Wolkiewicz had merely done her job and did not take sides."  (Certification of

Richard A. Byrd ¶ 8) [27-1].  Plaintiff "now state[s] that her investigation was biased, unfair and

incompetent."  (*Id.*)  And in contradiction to his deposition testimony that Lontoc honestly

believed the allegations against him, Plaintiff now states that Lontoc's 2008 investigation

"show[s] racial hostility toward [Plaintiff]" and shows that "Merrill Lynch would go to any end

to eliminate a perceived problem, even if they [sic] knew it was based upon false information."

(*Id.* ¶ 13.)[4]

Now proceeding under this new theory—that both the accusers and the investigators were

motivated by discriminatory animus—Plaintiff presents several facts that he believes support his

claims that the 2004 and 2008 investigations were racially biased.  As we will explain, we find

that Plaintiff has not adduced evidence sufficient for a reasonable trier of fact to find that

Defendant terminated him because of his race or sex.  His attempts to cast doubt on Defendant's

articulated legitimate reasons for terminating him are entirely unpersuasive.  Accordingly, he is

---

[4] We are inclined to agree with Defendant that Byrd's certification should be disregarded because it
contradicts his earlier testimony.  In *Jiminez v. All Am. Rathskeller, Inc.,* 503 F.3d 247, 253 (3d Cir.
2007), the Third Circuit defined  a "sham affidavit" as a "contradictory affidavit that indicates only that
the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of
defeating summary judgment."  *Id.*  The Court held that a "sham affidavit cannot raise a genuine issue of
material fact because it is merely a variance from earlier deposition testimony, and therefore no
reasonable jury could rely on it to find for the nonmovant."  *Id.*  But we need not decide this because
Plaintiff's certification suffers from a more fundamental defect: it provides no tangible evidence of any
discrimination on the part of Defendant but instead merely relates his own perception that he was
discriminated against.  A "conclusory self- serving affidavit[]" such as this is "insufficient to withstand a
motion for summary judgment."   *Perez v. N.J. Transit Corp.*, 341 F. App'x 757, 760 (3d Cir. 2009)
(quotations and citation omitted).

16

unable to carry his burden of proof on the issue of pretext, and there are no material facts in dispute which would allow him to survive summary judgment.

As for the 2004 investigation, the only fact Plaintiff presents that allegedly shows bias is Wolkiewicz's failure to interview Kemper.  But as explained above, this evidence hardly creates an inference of discrimination.  At most, it would suggest mere negligence.  As for the 2008 investigation, Plaintiff argues it was biased based on evidence that: (1) Lontoc mistreated Uva during the investigation; (2) Lontoc's investigation focused inordinately on Plaintiff's relationship with Uva; (3) the investigation ignored key witnesses who would have been favorable to Plaintiff; and (4) Plaintiff's supervisor, Matt Cissne, was retaliated against for supporting Plaintiff.  (Opp'n Br. 14.)  We address each of these pieces of evidence in turn.

First, Plaintiff points to Uva's interactions with Lontoc during Lontoc's investigation into the 2008 complaints. (Pl. SUF ¶ 16.)  Uva's certification states that, in meeting with Lontoc, Uva was first "berated" and accused of "attempting to retaliate against" one of Plaintiff's accusers in order to protect herself and Plaintiff.  (Pl. SUF ¶ 16 (citing Certification of Marina Uva ¶ 11).)  The link between Lontoc's alleged treatment of Uva and Plaintiff's allegation that he was discriminated against is tenuous at best.  Perhaps Lontoc actually believed that Uva was attempting to retaliate against one of Plaintiff's accusers to protect Plaintiff.  Or perhaps Lontoc's alleged harsh treatment of Uva had nothing to do with Plaintiff and instead related to other, unrelated workplace issues that Uva describes in her certification.  (*See* Certification of Marina Uva ¶ 8–9).  We can speculate on any number of reasons why Uva alleges she was mistreated, but that would be merely speculation, not evidence of discrimination.

Second, Uva's certification states that Lontoc then spent an inordinate amount of time focusing on Plaintiff's relationship with Uva, asking her "bizarre, uncomfortable and insulting questions" about Plaintiff and about their relationship. (*Id.*)  Plaintiff also notes that, during his

own meetings with Lontoc, Lontoc "expended an inordinately long period of time" discussing his relationship with Uva.  (Pl. SUF ¶ 23) (citing Certification of Richard A. Byrd ¶ 12). However, Plaintiff again conflates his perception of discrimination with actual evidence of discrimination.  Although Uva and Plaintiff may have felt that the questions were bizarre, a person in Lontoc's position conducting an investigation into alleged sexual harassment by an employee is certainly within reason to explore whether that employee has behaved in a sexual or romantic manner toward other employees.  That Byrd denies having been in a romantic relationship with Uva does nothing to cast doubt on the legitimacy of Lontoc's reasons for inquiring into the relationship.

Third, Plaintiff argues that Lontoc ignored witnesses who were favorable to Plaintiff. (Opp'n Br. 14.)  To support his argument, Plaintiff points to Lontoc's notes from the investigative file, which list the eleven employees she interviewed and include markings by some of the names.  (*See* Certification of Richard A. Byrd, Ex. F at ML0487).  Plaintiff claims that the five names marked with an "X" or an "M" are employees who did not corroborate the accusations.  (Pl. SUF ¶ 23.)  From this, Plaintiff "assum[es] maybe Lontoc accepted as truthful only those who supported the charge."  (*Id.*)  Plaintiff does not explain how he reached this conclusion, and it is difficult to see how he could.  Suffice it to say that the markings on the list, without something else to corroborate Plaintiff's assumption, do not constitute evidence of intentional discrimination.

Finally, Plaintiff observes that his supervisor, Matt Cissne, had his duties downgraded and his bonus reduced after his interview with Lontoc.  (Certification of Richard A. Byrd ¶ 12.) Plaintiff apparently believes this demotion was a result of Cissne defending Plaintiff, (*see* Opp'n Br. 30–31), although he offers no evidence to support this.  Lontoc's notes state, to the contrary, that Cissne was "disciplined" because he "needed to have more communication [with

18

employees]."  (*See* Certification of Richard A. Byrd, Ex. E at ML 0485).  Again, Plaintiff's contentions are nothing more than conclusions without evidentiary support.

 In addition to the evidence that supposedly shows Lontoc's bias, Plaintiff adds other facts which he believes support his claim.  First, Plaintiff names four other pairs in the CMA department who were perceived to be in a romantic relationship, although it is unclear who exactly "perceived" this besides Plaintiff.  (Pl. SUF ¶ 25); (Opp'n Br. 29).  Plaintiff alleges that, because none of the pairs involved mixed races, none were the subject of complaints or an investigation.  (Opp'n Br. 29.)  This attempt to show disparate treatment is unavailing.   There is no evidence that these other employees were ever accused of sexual harassment, so one would expect that they would not be the subject of sexual harassment investigations or terminated for violating the sexual harassment policy.  Second, Plaintiff submits a certification from another Merrill Lynch employee, Phillip Justin Hill.  Hill recounts an incident in which one of Plaintiff's accusers boasts about how she and other women got Plaintiff fired.  (Certification of Philip Justin Hill ¶¶ 6–9) [27].  Hill states that the accuser also complained about Plaintiff's relationship with a white woman.  (*Id.*)  But again, Plaintiff conflates his grievances against his subordinates with his attempts to show that he was terminated by his employer because of his race or sex.  Even if the accusers' complaints were false, Plaintiff has not shown that those investigating the complaints and those who made the ultimate decision to terminate Plaintiff did so with knowledge that the complaints were false and with the intent to discriminate against Plaintiff because of his race or sex.

 For all the reasons above, Plaintiff has not presented sufficient evidence for a jury to find that Defendant's articulated legitimate non-discriminatory reason for terminating him was pretextual.  Because Plaintiff would have the burden of proof on that issue at trial, we will grant summary judgment in favor of Defendant.

2.  <u>Mixed Motive</u>

In addition to his claim of pretext under the *McDonnell Douglas* standard, Plaintiff also makes a claim of discrimination under the mixed-motive theory of *Price Waterhouse*.  (Opp'n Br. 15.)  However, Plaintiff could not prevail at trial under a mixed-motive theory either.  Even under this theory, plaintiff would have to produce *some* evidence of discrimination.  In *Desert Palace,* the Supreme Court held that a plaintiff could satisfy his initial burden in a mixed motive case by "present[ing] sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice."  *Desert Palace*, 539 U.S. at 101 (citing 42 U.S.C. § 2000e-2).  But as we discussed above, Plaintiff has not presented evidence of discrimination sufficient for a reasonable jury to find in his favor.  Because he cannot show that his termination resulted from discriminatory animus, it would not matter whether he proceeded under pretext or mixed-motive theory.  Accordingly, Defendant's motion for summary judgment will be granted.

IV. <u>CONCLUSION</u>

For the reasons stated above, the Court will grant Defendant's motion for summary judgment.  The Court will issue an appropriate order to follow.


*/s/ Anne E. Thompson*
ANNE E. THOMPSON, U.S.D.J.

DATED: July 8, 2011

20
